# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, ET AL,
*Plaintiffs-Appellants*,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, ET AL.,
*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the Western District of Missouri
District Court Case No.: 6:21-cv-03219-MDH

———————————

## MOTION OF CATO INSTITUTE FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

———————————

Thomas A. Berry
*Counsel of Record*
Nicholas DeBenedetto
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 789-5202
tberry@cato.org

May 18, 2023

## RULE 26.1 CORPORATE DOSCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

## RULE 29 DISCLOSURE STATEMENT

No counsel for either party authored this brief in whole or in part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission.

## MOTION FOR LEAVE TO PARTICIPATE AS *AMICUS*

Pursuant to this Court's discretion, the Cato Institute respectfully moves for leave to file an *amicus* brief supporting Plaintiffs-Appellants Brooke Henderson, et al., to assist the Court in its consideration of their claims. All parties were provided with notice of *amicus*'s intent to file as required under Rule 29(2). Counsels for Plaintiffs-Appellants Kimberly S. Hermann, Braden H. Boucek, and Celia Howard O'Leary have consented to the filing of this brief. Counsel for Defendants-Appellees Ransom A. Ellis, III has not provided consent to this brief.

## INTEREST OF *AMICUS CURIAE*

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets,

1

and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual Cato Supreme Court Review.

This case concerns *amicus* because it involves the application of foundational First Amendment principles to protect public employees from being coerced into affirming views with which they do not agree, as well as the First Amendment freedom to pursue public interest litigation.

## ISSUES TO BE ADDRESSED BY *AMICUS*

1. *Amicus* will discuss why the district court erred in concluding that Plaintiffs suffered no injury-in-fact sufficient to allege unconstitutionally compelled speech. This will assist the Court in determining whether to reverse the district court's grant of summary judgment in favor of Defendants-Appellees.

2. *Amicus* will discuss how the district court's fee and costs award infringes on Plaintiffs' First Amendment freedom to pursue public interest litigation. This will assist the Court in determining whether to reverse the district court's award of attorney fees and costs against Plaintiffs-Appellants.

Appellate Case: 23-1880     Page: 3     Date Filed: 05/19/2023 Entry ID: 5279060

## CONCLUSION

For the reasons stated above, the Cato Institute respectfully requests that the Court grant this motion to participate as *amicus* in the above-captioned case.

Respectfully submitted,

<u>/s/ *Thomas A. Berry*</u>
Thomas A. Berry
   *Counsel of Record*
Nicholas DeBenedetto
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 789-5202
tberry@cato.org

Dated: May 18, 2023

3

## CERTIFICATE OF COMPLIANCE

Counsel certifies under FRAP 32(g) that the foregoing motion meets the formatting and type-volume requirements set under FRAP 27(d) and FRAP 32(a). The motion is printed in 14-point, proportionately-spaced typeface utilizing Microsoft Word and contains 419 words, including headings, footnotes, and quotations, and excluding all items identified under FRAP 32(f).

*/s/ Thomas A. Berry*

Dated: May 18, 2023

*Counsel for Amicus Curiae*
*Cato Institute*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

*/s/ Thomas A. Berry*

Dated: May 18, 2023

*Counsel for Amicus Curiae*
*Cato Institute*

Appellate Case: 23-1880    Page: 5    Date Filed: 05/19/2023 Entry ID: 5279060

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, ET AL,
*Plaintiffs-Appellants*,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, ET AL.,
*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the Western District of Missouri
District Court Case No.: 6:21-cv-03219-MDH

———————————

**BRIEF OF *AMICUS CURIAE* CATO INSTITUTE IN SUPPORT OF
PLAINTIFFS-APPELLANTS BROOKE HENDERSON, ET AL**

———————————

Thomas A. Berry
  *Counsel of Record*
Nicholas DeBenedetto
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 789-5202
tberry@cato.org

May 18, 2023

## CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit public policy research foundation operating under § 501(c)(3) of the Internal Revenue Code. The Cato Institute is not a subsidiary or affiliate of a publicly owned corporation, and it does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus's* participation.

/s/ *Thomas A. Berry*

Dated: May 18, 2023           *Counsel for Amicus Curiae Cato Institute*

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE* .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ...............................................................................6

   I.   The District Court Erred in Concluding that Plaintiffs Suffered No Injury-In-Fact Sufficient to Allege Unconstitutionally Compelled Speech ...................6

   II.  The District Court's Award of Attorney's Fees to Defendants Violates Plaintiffs' First Amendment Associational Freedoms ..................................14

CONCLUSION .............................................................................22

CERTIFICATE OF BRIEF LENGTH & VIRUS CHECK....................................23

CERTIFICATE OF SERVICE ...............................................................24

Appellate Case: 23-1880     Page: 8     Date Filed: 05/19/2023 Entry ID: 5279060

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Connick v. Myers*, 461 U.S. 138 (1983)...............................................................8

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013)..........................................7

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................8

*In re Primus*, 436 U.S. 412 (1978)........................................................ 5, 15, 16, 18

*Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419 (9th Cir. 2008) ...............................7

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)............................................7

*Katosang v. Wasson-Hunt*, U.S. Dist. LEXIS 122122 (W.D. Mo. Nov. 18, 2010) ...................................................................................................................8

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ...................................7, 8

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958).....................................14, 18

*NAACP v. Button*, 371 U.S. 415 (1963)................................................. 5, 15, 16, 21

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)......................................................8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ........................7

*Wash. Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) .......................................7, 12

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................... passim

*Williams v. City of Carl Junction*, 523 F.3d 841 (8th Cir. 2008) ...........................20

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................. 6, 8, 9, 11

**Statutes**

42 U.S.C. § 1983 ................................................................................................14

42 U.S.C. § 1988 ............................................................................................5, 14

**Other Authorities**

*About Us*, SE. LEGAL FOUND. (last visited May 14, 2023 1:00 PM) ........................17

Appellate Case: 23-1880    Page: 9    Date Filed: 05/19/2023 Entry ID: 5279060

Ann Southworth, *Conservative Lawyers and the Contest Over the Meaning of "Public Interest Law,"* 52 UCLA L. REV. 1223 (2005)....................................18

Coleman Hughes, *How to Be an Anti-Intellectual*, CITY J. (Oct. 27, 2019)............11

Eugene Volokh, *The Law of Compelled Speech*, 97 TEX. L. REV. 355 (2018) .....................................................................................................7, 14

GianCarlo Canaparo, *Permission to Hate: Antiracism and* Plessy, 27 TEX. REV. L. & POL. 97 (2023) .......................................................................11

*Henderson v. Springfield Public Schools*, SE. LEGAL FOUND. (last visited May 14, 2023 1:30 PM)............................................................................19

*History*, SE. LEGAL FOUND. (last visited May 14, 2023 1:00 PM) ..........................17

IBRAM X. KENDI, HOW TO BE AN ANTIRACIST (2019)..............................................11

Layne Rouse, *Battling for Attorneys' Fees: The Subtle Influence of Conservatism in 42 U.S.C. Section 1988*, 59 BAYLOR L. REV. 973 (2007)..........20

Martha F. Davis, *Our Better Half: A Public Interest Lawyer Reflects on Pro Bono Lawyering and Social Change Litigation*, 9 AM. U.J. GENDER SOC. POL'Y & L. 119 (2001) ....................................................................17

*Protecting Free Speech*, SE. LEGAL FOUND. (last visited May 14, 2023 1:00 PM)....................................................................................................18

Tobias Barrington Wolf, *Compelled Affirmations, Free Speech, and the U.S. Military's Don't Ask, Don't Tell Policy*, 63 BROOK. L. REV. 1141 (1997) ..................................................................................................13

iv

# INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and issues the annual *Cato Supreme Court Review*. This case interests Cato because it concerns the application of foundational First Amendment principles to protect public employees from being coerced into affirming views with which they do not agree, as well as the First Amendment freedom to pursue public interest litigation.

---

[1] No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission.

Appellate Case: 23-1880    Page: 11    Date Filed: 05/19/2023 Entry ID: 5279060

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the Fall of 2020, the Springfield Public School District (SPS or the District) implemented mandatory district-wide "equity" trainings in response to the Black Lives Matter Protests that erupted after the killing of George Floyd. All employees of the District were required to attend a session, not just teachers. SPS employees were told that if they did not participate, the District would dock their pay and they could lose necessary professional development credit.

The stated goal of the training was to foster a shared understanding of "identity and self" and "complex issues of systemic racism and Xenophobia." Participants were provided with an overview which informed them that they would learn about topics including "Oppression, White Supremacy, and Systemic Racism," receive tools on "how to become Anti-Racist educators," and conduct discussions in large and small group settings. The training also included several interactive exercises that required participants to share reactions to videos, write down answers to instructor questions, answer multiple-choice questions, and fill out charts related to concepts presented by the training.

Plaintiffs Brooke Henderson and Jennifer Lumley, non-teacher employees of SPS, strongly disagreed with the viewpoint being advanced by Defendants through the training. For example, the training defined "white supremacy" as "the all-encompassing centrality and assumed superiority of people defined and perceived

2

as white," which "is a highly descriptive term for the culture we live in." The training also advanced several other contestable and value-laden assertions, including that: believing in colorblindness is a form of white supremacy; "In the United States, systems of oppressions [sic] (like systemic racism) are woven into the very foundation of American culture, society, and laws"; "Society's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups"; white people possess "privilege" and denying its existence is a form of white supremacy; and white people are the oppressors of other races. Participants were also told that being "anti-racist" means "advocating for changes in political, economic, and social life" and that being sufficiently "anti-racist" forbids "remain[ing] silent or inactive" because doing so constitutes "white silence"—a form of white supremacy.

During the training, employees were required to answer questions and give responses informed by these assertions. Participants were required to answer "Quick Check" questions in online modules. The questions presented two answers, only one of which was correct in the eyes of SPS. In order to advance through the modules and receive credit, participants had to give the SPS-approved answer. Participants were also required fill out a "Social Identity Map" and locate themselves on an "Oppression Matrix." In another activity contained in the virtual version of the training, participants were expected to hold up one of four signs labeled "Strongly

Agree," "Agree," "Disagree," or "Strongly Disagree" to indicate their responses to prompts provided by the instructor. Plaintiffs were told in advance that they would be asked to do this and were instructed not to hold up the "Disagree" or "Strongly Disagree" signs in response to the prompts because doing so would be considered disrespectful. Henderson held up the "Agree" sign several times to indicate agreement with premises to which she actually objected, out of concern that she might not get credit for the training if she were perceived as being disrespectful.

Henderson and Lumley each attempted to share their actual beliefs at certain moments in the training. When they attempted to share their genuine beliefs, they were each rebuffed by the equity trainers. As a result, neither Henderson nor Lumley attempted to share their actual thoughts and feelings for the rest of their respective sessions.

Plaintiffs filed suit and raised several claims under the First Amendment including compelled speech, content and viewpoint discrimination, and unconstitutional conditions of employment. Defendants moved for summary judgment, which the district court granted after concluding that Plaintiffs lacked an injury-in-fact and thus could not establish standing. Defendants also moved for attorney's fees which, after additional briefing, the district court awarded in the amount of $312,869.50, plus costs of $3,267.10.

Appellate Case: 23-1880     Page: 14     Date Filed: 05/19/2023 Entry ID: 5279060

In this brief, *amicus* will focus on two aspects of the district court's decision that raise substantial First Amendment issues. First, the court's analysis of Plaintiffs' compelled speech claim conflicts with the Supreme Court's foundational decision in *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943). *Barnette* makes clear that a person suffers a First Amendment injury at the moment he or she is required to affirm a belief to which he or she objects. Plaintiffs repeatedly had to provide the "correct" response and profess agreement with SPS's ideas about equity, white supremacy, and racism when they answered questions and responded to instructor prompts even though they strongly disagreed. Additionally, the logic of *Barnette* makes clear that even though Plaintiffs each expressed their disagreement with the material once during their respective sessions, they still suffered First Amendment injury during other portions of the training when they were coerced into demonstrating false assent.

Second, the district court's decision to award attorney's fees and costs under 42 U.S.C. § 1988 violates Plaintiffs' First Amendment right to participate in public interest litigation under *NAACP v. Button*, 371 U.S. 415 (1963) and *In re Primus*, 436 U.S. 412 (1978). The court justified its award, in large part, by referencing Plaintiffs' political motivations for bringing this litigation. The court thus essentially punished Plaintiffs for exercising their First Amendment freedoms. This judicial retribution against plaintiffs who have engaged in public interest litigation not only

5

injures the Plaintiffs in this case, it also threatens to chill future *bona fide* public interest litigation.

This Court should reverse the district court's grant of summary judgment and award of attorney's fees and costs in favor of Defendants.

## ARGUMENT

**I. The District Court Erred in Concluding that Plaintiffs Suffered No Injury-In-Fact Sufficient to Allege Unconstitutionally Compelled Speech**

The district court made two significant errors in its analysis rejecting Plaintiffs' compelled speech claim for lack of injury-in-fact. First, the court failed to recognize when and how Plaintiffs were compelled to speak. And second, the court incorrectly relied on dissents voiced by Plaintiffs at particular moments during their sessions to reject the entirety of their compelled speech claim. If allowed to stand, the court's order would not only undermine Plaintiffs' First Amendment rights, it would also provide a roadmap for other government entities to compel the speech of their employees with impunity.

Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Id.* (citing *Barnette*, 319 U.S. at 633–34). The First Amendment's protection for freedom of mind (or

6

conscience) ensures that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. A law "[c]ompelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018). Critically, First Amendment injuries due to compelled speech occur the moment individuals are required "to speak when they otherwise would have refrained." *Wash. Post v. McManus*, 944 F.3d 506, 514 (4th Cir. 2019); *see also Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013); *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 426 (9th Cir. 2008) (recognizing that compelled speech constitutes an injury-in-fact). Pure speech compulsions violate the First Amendment whether or not they also restrict speech or lead observers to "wrongly believe that compelled parties endorsed the compelled speech." Eugene Volokh, *The Law of Compelled Speech*, 97 TEX. L. REV. 355, 369 (2018).

The protections of the First Amendment "extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). To be sure, "If a public employee speaks 'pursuant to [his or her] official duties,' [the Supreme Court] has said the Free Speech Clause generally will not

7

shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). If, however, a government employee "speaks as a citizen addressing a matter of public concern," then the First Amendment may apply. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). And it is clear that "[s]peech about racial discrimination is a matter of public concern," *Katosang v. Wasson-Hunt*, U.S. Dist. LEXIS 122122, at *4 (W.D. Mo. Nov. 18, 2010) (quoting *Connick v. Myers*, 461 U.S. 138, 148 (1983)).

The Supreme Court first addressed compelled speech in *West Virginia v. Barnette*. There, the Court invalidated an act of the West Virginia legislature requiring daily flag salute and recitation of the pledge of allegiance in public schools. Several students who were Jehovah's Witnesses had objected to this requirement, citing their belief that reciting the pledge of allegiance is an act of idolatry. *Barnette*, 319 U.S. at 629. The Court rested its decision on the fact that "the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind," and that forcing a student to recite the pledge requires that he "utter what is not in his mind." *Id.* at 633–34.

The Supreme Court later invoked *Barnette* in *Wooley v. Maynard* to invalidate a New Hampshire law requiring residents to display the "ideological" motto "live free or die" on their license plates. 430 U.S. 714–17. The Court explained that "a

state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable. . . . 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment of our Constitution to reserve from all control.'" *Id.* at 715 (quoting *Barnette*, 319 U.S. at 642).

In this case, the district court failed to correctly recognize the instances when Plaintiffs were forced to affirm beliefs and attitudes of mind to which they objected. During the trainings, Plaintiffs were required to affirm to the District which responses and approaches to questions of social and political concern were correct according to the District and its equity trainers. This occurred in the context of *mandatory* trainings that, if not completed to the satisfaction of the District, would result in a loss of pay and loss of the ability to earn professional development credit.

The most obvious of these compelled affirmations occurred when Plaintiffs were required to answer "Quick Check" questions that were included in online modules accompanying the training. Plaintiffs were presented with two possible answers, only one of which was "correct" in the eyes of the District. Plaintiffs disagreed with the mandatory District-selected answer, but nonetheless had to affirm the District's perspective if they wished to advance through the modules and avoid loss of pay and credit. Each time Plaintiffs provided an answer to which they

9

objected, they were required to "utter what [was] not in [their] mind[s]." *Barnette*, 319 U.S. at 634.

Plaintiffs were also compelled to affirm the District's viewpoint during a portion of the virtual training in which they were expected to hold up one of four signs labeled "Strongly Agree," "Agree," "Disagree," or "Strongly Disagree" to indicate their responses to prompts provided by the instructor. Plaintiffs were told in advance that they would be asked to do this and were instructed not to hold up the "Disagree" or "Strongly Disagree" signs because doing so would be considered disrespectful. This directive was given against the backdrop that Plaintiffs needed to satisfactorily participate in these mandatory trainings in order to receive credit and compensation. As a result, Plaintiff Henderson held up the "Agree" sign several times to indicate agreement with premises to which she actually objected, out of concern that she might not get credit for the training if she were perceived as being disrespectful.

Perhaps the most serious infringement upon Plaintiffs' freedom of mind occurred during exercises in which they were required to locate themselves on an "Oppression Matrix" and a "Social Identities chart." The underlying premises for both of these activities, as explained by the equity trainers, included: that American society is characterized by "the all-encompassing centrality and assumed superiority of people defined and perceived as white"; that "colorblindness" constitutes a form

of "covert white supremacy"; that "In the United States, systems of oppressions [sic] (like systemic racism) are woven into the very foundation of American culture, society, and laws"; and that "Society's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." Indeed, "anti-racism" is itself a distinct ideological viewpoint with "two central premises from which its conclusions and policy prescriptions flow." GianCarlo Canaparo, *Permission to Hate: Antiracism and* Plessy, 27 TEX. REV. L. & POL. 97, 121 (2023). The first is that "racism is the only cause of disparities" between racial and ethnic groups. *Id.* at 121, 131–35. And the second is that "the cure for [past] discrimination is [present] discrimination." *Id.* at 135. These suppositions, taken together, inform anti-racism's view of "equity" which is defined as "numerically equal outcomes between races." Coleman Hughes, *How to Be an Anti-Intellectual*, CITY J. (Oct. 27, 2019) (reviewing IBRAM X. KENDI, HOW TO BE AN ANTIRACIST (2019)).[2]  Anti-racism's policy for achieving "equity," therefore, requires "antiracist discrimination" to establish this numerical equality between racial and ethnic groups. Canaparo, *supra*, 135–37.

Whatever one may think of the underlying merits of these assertions and policy prescriptions, they are no less "ideological" than the "live free or die" motto that New Hampshirites were required to display in *Wooley*. *See* 430 U.S. at 713–15.

---

[2] Available at https://tinyurl.com/ytunwzxx.

Appellate Case: 23-1880      Page: 21      Date Filed: 05/19/2023 Entry ID: 5279060

Thus, by requiring Plaintiffs to engage in the aforementioned exercises, the District forced Plaintiffs to adopt the District's own ideological presuppositions, and "speak when they otherwise would have refrained." *McManus*, 944 F.3d at 514. Contrary to the district court's conclusion, the District did maintain a policy that required Plaintiffs to actually express viewpoints at odds with their personal opinions. The District's policy implicitly and explicitly threatened adverse consequences if Plaintiffs failed to participate in and engage with the trainings.

The district court's second critical error was its conclusion that Plaintiffs did not suffer a First Amendment injury because they were able to express their personal views in isolated moments during their training sessions. This conclusion misconstrues the Supreme Court's vital holding in *Barnette*.

The Court's reasoning in *Barnette* makes clear that the opportunity to disclaim the viewpoint one is being compelled to affirm does not cure the underlying First Amendment violation. The *Barnette* students could have easily registered their disagreement with the pledge. "Since the pledge was conducted before classmates and teachers with whom the students interacted with on a daily basis, they could [have] quite effectively qualif[ied] their participation in the pledge with explanations to their peers that they were participating involuntarily and that the pledge ran counter to their beliefs." Tobias Barrington Wolf, *Compelled Affirmations, Free Speech, and the U.S. Military's Don't Ask, Don't Tell Policy*, 63 BROOK. L. REV.

Appellate Case: 23-1880     Page: 22     Date Filed: 05/19/2023 Entry ID: 5279060

1141, 1200 (1997). But the Court, quite correctly, was not concerned with "whether the statute before it required the students actually to believe the words that they spoke or merely to recite them along with their classmates" and instead recognized that the intimate and personal way in which the students were compelled to affirm a contrary belief by standing, saluting the flag, and reciting the pledge was inherently injurious. *Id.* at 1200 n.9; 1200–01.

In this case, Plaintiffs were similarly required to affirm views that violated their consciences with respect to the weighty moral issues of racism and prejudice. Their injuries occurred every time they answered questions and responded to instructor prompts during the trainings in a way that betrayed their own beliefs. Pushing back on the idea that "only white people can be racist" in one moment does not offset the injury that occurs when one is required to adopt the presupposition that "systems of oppression . . . are woven into the very foundation of American culture, society, and laws" in the next.

The district court's assertion that "Lumley's coworkers cannot both berate her for opposing equity and anti-racism and simultaneously associate her with those concepts" was error. Plaintiffs' speech was compelled each time they were required to affirm the District's view in answering questions or engaging with an instructor prompt, whether or not others present thought those affirmations were genuine. The district court incorrectly presumed that injury-in-fact for compelled speech requires

13

observers to "wrongly believe that compelled parties endorse[] the compelled speech." Volokh, *supra*, at 369. As noted above, the relevant inquiry is instead simply whether a speaker is required to speak when she otherwise would have remained silent.

Plaintiffs have sufficiently identified an injury-in-fact to support their compelled speech claim. This Court should reverse the decision of the district court.

## II. The District Court's Award of Attorney's Fees to Defendants Violates Plaintiffs' First Amendment Associational Freedoms

The district court awarded attorney's fees in the amount of $312,869.50 to SPS. If allowed to stand, this unusual award of attorney's fees to Defendants would punish private citizens for exercising their right to participate in public interest litigation and discourage them from doing so. This Court should reverse the district court's order to ensure that the attorney's fee provision of 42 U.S.C. § 1988 is not used to undermine the very rights that 42 U.S.C. § 1983 was enacted to protect.

The "freedom to engage in association for the advancement of beliefs and ideas" is an implicit guarantee of the First Amendment. *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). This guarantee "require[s] a measure of protection for 'advocating lawful means of vindicating legal rights,' . . . including '[advising] another that his rights have been infringed and [referring] him to a particular attorney or group of attorneys . . . for assistance.'" *Primus*, 436 U.S. at

14

432 (quoting *Button*, 371 U.S. at 434). As a result, the work of public interest organizations—which seek to advance particular causes through litigation—receives special solicitude under the First Amendment. For such organizations, "'litigation is not a technique of resolving private differences'; it is 'a form of political expression' and 'political association.'" *Id.* at 428 (quoting *Button*, 371 U.S. at 429, 431).

The Supreme Court established key protections for public interest lawyers and clients in a series of decisions in the 1960s and 70s—the most notable of which were *NAACP v. Button* and *In re Primus*. In *Button*, the Court determined that a Virginia law that would have prohibited the NAACP from soliciting prospective litigants violated the First Amendment's protections for free expression and association. 371 U.S. at 437–38. The Court explained that the State's interest in regulating the "traditionally illegal practices of barratry, maintenance and champerty" did not justify the solicitation ban, in part because "[m]alicious intent was of the essence of the common-law offenses of fomenting or stirring up litigation," and "the exercise . . . of First Amendment rights to enforce constitutional rights through litigation, as a matter of law, cannot be deemed malicious." *Id.* at 439–40. The Court noted that the NAACP was dedicated to the mission of desegregation, which it pursued through litigation. "[A]ssociation for litigation," the Court explained, "may be the most effective form of political association" for the NAACP, and thus, "a statute broadly

15

curtailing group activity leading to litigation may easily become a weapon of oppression." *Id.* at 431, 435–36.

In *Primus*, the Court built upon the foundation it laid in *Button* when it held that South Carolina's decision to sanction an ACLU attorney who solicited a potential litigant was unconstitutional. 436 U.S. at 431–32. The Court rejected any meaningful distinction between the NAACP and the ACLU for First Amendment purposes, finding that litigation played a similar role in both organizations' missions. *Id.* at 427–32. The Court explained that an ACLU attorney's solicitation "comes within the generous zone of First Amendment protection reserved for associational freedoms. The ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *Id.* at 431. Additionally, as it did in *Button*, the Court also rejected the argument that "[t]he State's interests in preventing the 'stirring up' of frivolous or vexatious litigation and minimizing commercialization of the legal profession" outweighed the First Amendment interests of the ACLU and its attorney. *Id.* at 436–37. The Court noted that "considerations of undue commercialization of the legal profession [for private gain] are of marginal force where, as here, a nonprofit organization offers its services free of charge to individuals who may be in need of legal assistance and may lack the financial means and sophistication necessary to tap alternative sources of aid." *Id.* at 437.

16

Applying those principles to this case, the district court erred in its award of attorney's fees to Defendants. And while Plaintiffs did not specifically advance a First Amendment defense to the award of attorney's fees, this case's origin as a public interest suit should inform the Court's review of the district court's fee award and, more specifically, the court's conclusion that Plaintiffs' claims were frivolous.

The Southeastern Legal Foundation (SLF) is "a national, nonprofit legal organization dedicated to defending liberty and Rebuilding the American Republic" that "represents clients free of charge where [its] involvement will make a lasting difference for all Americans." *About Us*, SE. LEGAL FOUND. (last visited May 14, 2023 1:00 PM).[3] SLF is not "a single issue organization"; rather, it works to "combat government overreach, guard individual liberty, protect free speech, and secure property rights." *Id.* SLF was established in 1976 as part of the first generation of conservative and libertarian public interest law firms that were founded in the 1970s, and which themselves were modeled on the NAACP Legal Defense Fund. *See*, *e.g.*, *History*, SE. LEGAL FOUND. (last visited May 14, 2023 1:00 PM)[4]; Martha F. Davis, *Our Better Half: A Public Interest Lawyer Reflects on Pro Bono Lawyering and Social Change Litigation*, 9 AM. U.J. GENDER SOC. POL'Y & L. 119, 125 (2001);

---

[3] Available at https://tinyurl.com/bdhfvuac.

[4] Available at https://tinyurl.com/2m5c6fah.

Appellate Case: 23-1880     Page: 27     Date Filed: 05/19/2023 Entry ID: 5279060

Ann Southworth, *Conservative Lawyers and the Contest Over the Meaning of "Public Interest Law,"* 52 UCLA L. REV. 1223, 1258–59 (2005). Recently, SLF has increased its focus on matters of free speech in response to what it believes to be an increasing number of policies and curricula in public schools that "espouse radical views" that are hostile to those of parents, students, and teachers. *Protecting Free Speech*, SE. LEGAL FOUND. (last visited May 14, 2023 1:00 PM).[5] For SLF, litigation is a form of political expression and association. *See Primus*, 436 U.S. at 428.

And if the freedom to associate in order to advance public interest litigation protects the activities of public interest *lawyers*, then this First Amendment protection must logically extend to their *clients* as well. The First Amendment would offer little protection if the government could disrupt the right "to engage in association for the advancement of beliefs and ideas" by simply punishing litigants for attempting to enforce constitutional provisions in court. *Patterson*, 357 U.S. at 460.

In this case, Plaintiffs and their counsel have challenged what they believe to be compelled speech in the form of "divisive and discriminatory programming that promotes treating individuals differently based on skin color" that requires them to affirm views contrary to their own deeply held beliefs that "America should be

---

[5] Available at https://tinyurl.com/ya66sv5r.

Appellate Case: 23-1880     Page: 28     Date Filed: 05/19/2023 Entry ID: 5279060

colorblind." *Henderson v. Springfield Public Schools*, SE. LEGAL FOUND. (last visited May 14, 2023 1:30 PM).[6] At root, this case seeks to invoke the protections of the First Amendment to an important, hotly contested, and socially divisive matter of public policy just like the famous test cases filed by the NAACP, ACLU, and others that were considered cutting-edge and even provocative at the time but the results of which now comprise bedrock principles of free-speech jurisprudence, and others.

In justifying its award of attorney's fees to Defendants, the district court asserted that "the political undertones of Plaintiffs' allegations . . . demonstrate how Plaintiffs' lawsuit has trivialized the important work of the federal judiciary. Plaintiffs attempted to drag Defendants into a political dispute rather than seek remedy for a genuine harm." The court further described Plaintiffs' suit as a "frivolous political disagreement." But the mere fact that Plaintiffs are pursuing what could be described as a political objective in court does not justify any award of attorney's fees to Defendants—any more than if the NAACP had not prevailed in its effort to vindicate its First Amendment right to pursue public interest litigation in *Button*. To award Defendants any attorney's fees—let alone more than quarter-

---

[6] Available at https://tinyurl.com/522zvc5u.

million dollars—under the facts of this case is to punish these Plaintiffs for engaging in constitutionally protected activity and discourage others from doing likewise.

The purpose of Section 1988 "was to ensure effective access to the judicial process for persons with civil rights grievances by creating an incentive for attorneys to take [civil rights] cases." Layne Rouse, *Battling for Attorneys' Fees: The Subtle Influence of Conservatism in 42 U.S.C. Section 1988*, 59 BAYLOR L. REV. 973, 978 (2007). "Congress had two objectives in enacting Section 1988. First, Congress recognized that awarding fees carried a remedial objective, providing private citizens with the means to remedy both their individual harm and the harm done to the law." *Id.* at 979. "Second, Congress recognized awarding fees carried a deterrent objective, to prevent those who violated the nation's laws from proceeding with impunity." *Id.* (internal quotations omitted). Today, a prevailing defendant in a Section 1983 case is entitled to attorney's fees "only in very narrow circumstances." *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008) (internal quotations omitted). "[A] plaintiff should not be assessed his opponent's attorney's fees unless the district court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id.* (internal quotations omitted).

Absolutely nothing about Plaintiff's suit supports the notion that it is without legal merit, let alone completely groundless. Instead, Plaintiffs and their counsel

20

brought this suit in a good-faith attempt to vindicate their free speech rights as public employees and establish First Amendment precedent in a fresh factual context of major and growing importance. Plaintiffs will only be successful in this aim if they obtain a published decision in their favor from this Court or the Supreme Court, which means they must be prepared to fully litigate dispositive motions and pursue their claims through all available levels of review. Their demonstrated commitment to pursuing their claims through multiple levels of appeal cannot plausibly (or fairly) be characterized as a bare desire to harass the Defendants by dragging them into some baseless lawsuit over a simple political disagreement. It is ineluctably clear on the face of the pleadings that this case represents a genuine effort by the Plaintiffs to vindicate rights that they sincerely—and plausibly—believe have been violated by the government.

The Supreme Court has counseled that "the exercise . . . of First Amendment rights to enforce constitutional rights through litigation, as a matter of law, cannot be deemed malicious." *Button*, 371 U.S. at 439–40. Following the example set by their public interest forebearers, Plaintiffs and their counsel brought this suit as a means of achieving the congressionally and judicially sanctioned objective of enforcing the Free Speech Clause. They plainly did so in good faith, and not out of a bare desire to harass the Defendants. If the district court's order is permitted to stand, Plaintiffs would be punished for exercising the same freedoms that Section

21

1988 was enacted to encourage attorneys to defend, and future public-interest litigation in this area would be significantly chilled.

## CONCLUSION

The district court's award of summary judgment and attorney's fees and costs in favor of Defendants should be reversed.

Respectfully submitted,

/s/ *Thomas A. Berry*

Thomas A. Berry
   *Counsel of Record*
Nicholas DeBenedetto
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 789-5202
tberry@cato.org

Dated: May 18, 2023

22

## CERTIFICATE OF BRIEF LENGTH & VIRUS CHECK

The undersigned counsel certifies:

- In accord with FRAP 32(g), this *amicus curiae* brief meets the formatting and type-volume requirements of FRAP 29(a)(4), 29(b)(4), and 32(a). This *amicus curiae* brief is printed in 14-point, proportionately spaced typeface utilizing Microsoft Word and contains 4,742 words. This includes headings, footnotes, and quotations, and excludes all items identified by FRAP 32(f).

- Per 8th Cir. R. 28A(h)(2), this brief has been scanned and found virus free using Bitdefender Endpoint Security Tools.

/s/ *Thomas A. Berry*

Dated: May 18, 2023                    *Counsel for Amicus Curiae Cato Institute*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on May 18, 2023, he electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the Eighth Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Thomas A. Berry*

Dated: May 18, 2023                          *Counsel for Amicus Curiae Cato Institute*

Appellate Case: 23-1880    Page: 34    Date Filed: 05/19/2023 Entry ID: 5279060